### 20743

The UNIVERSITY OF SOUTH CAROLINA, Plaintiff, v. Wade T. BATSON and Paul Blackstock, Defendants.

(246 S. E. (2d) 882)

---

*Phillip M. Grier* and *Timothy G. Quinn,* Columbia, *for plaintiff; Atty. Gen. Daniel R. McLeod, Deputy Atty. Gen. C. Tolbert Goolsby, Jr.,* and *Asst. Atty. Gen. Kenneth P. Woodington,* Columbia, *of counsel.*

*Lucy M. Knowles, Victoria L. Eslinger* and *Mark L. Archer,* Columbia, *for defendants.*

*Clayton N. Gompf, Jr.,* Columbia, *Deputy Commissioner/ Gen. Counsel, State Human Affairs Commission, amicus curiae.*

August 15, 1978.

LEWIS, ·Chief Justice.

This action involves the validity of a retirement policy established and enforced by the University of South Carolina, which mandates that teaching faculty retire at the age of sixty-five (65) years. The defendants are tenured professors at the University and challenge their mandatory retirement at age sixty-five (65) upon the ground that Section 9-1-1530 of the 1976 Code of Laws establishes a mandatory retirement age of seventy (70) years and the University is without authority to alter or vary that age.

The position of the defendants is supported by the plain terms of the statute. Section 9-1-1530 provides:

Any employee in service who has attained the age of seventy years shall be retired forthwith . . ..

The remainder of the statute carves out exceptions whereby employment may be extended beyond seventy (70) years.

There are no provisions for retirement of "employees" prior to the age of seventy (70). In the absence of any exceptions for retirement of "employees" prior to seventy (70), it must be concluded that the General Assembly intended that there be none. When the statute mandates retirement at seventy (70), without exception, it clearly sets seventy (70) years as both the maximum and minimum mandatory retirement age.

It is manifest that where the language of a statute is plain and unambiguous, there is no occasion for construction by this court. As stated in 82 C. J. S. Statutes § 322:

An . . . unambiguous statute cannot be extended beyond its plain and obvious meaning, or restricted to, or confined in operation within narrower limits or bounds than manifestly intended by the legislature.

■ The theory, upon which it is sought to write into the statute a non-existent provision authorizing mandatory retirement at age sixty-five (65) years, or presumably any other age less than seventy (70) that the University might conclude proper, rests solely upon the strained implication that the failure of the Legislature to specifically negate all alternatives renders the statute ambiguous. This position is contrary to the general rule of statutory construction that affirmative words imply a negative of that which is not affirmed. See 82 C. J. S. Statutes § 336; *Home Building and Loan Association v. City of Spartanburg,* 185 S. C. 313, 194 S. E. 139; *Little v. Town of Conway,* 171 S. C. 27, 171 S. E. 447. Thus the affirmative language that employees "shall be retired" at age seventy (70) implicitly proscribes their mandatory retirement prior to that age. The plain language of the statute allows for no interpretation restricting its application.

■ The legislative history of the South Carolina Retirement Act conclusively supports the foregoing conclusion. When this statute was initially enacted in

1945, employees of the University were classified as "teachers" not "employees." Under the 1945 Act teachers and employees were both retired at age sixty-five (65); however, employees could continue to work until age seventy (70) with employer approval.

In 1949 the South Carolina Retirement Act was amended to reclassify college professors as "employees". 46 Stat. 424. At the same time the basic retirement age for employees was increased to age seventy (70) while teachers continued to be involuntarily retired at age sixty-five (65). See Code Sections 9-1-10, 9-1-1520, 9-1-1530. The 1949 amendment removed every basis for a contention that the General Assembly intended to leave the mandatory retirement of professors to the discretion of the University.

It is argued, however, that Code Section 59-117-40, the University's Enabling Act, authorizes it to fix minimum retirement ages. While this statute grants broad power to the University, it is not granted the power to contravene statutory laws of the State, either by rule or private contract. Further the Enabling Act relied upon was amended to its present form in 1953, some four years after the 1949 amendment to the Retirement Act. There is nothing in the Enabling Act to indicate that the Legislature in 1953 intended to authorize the University to establish its own retirement schedule, in the light of the 1949 amendment to the Retirement Act wherein the Legislature succinctly and unequivocally determined the appropriate age for the retirement of professors.

The rationale underlying the University's determination that professors should retire at sixty-five (65) is totally irrelevant to a determination of the present issue since, in any event, there is a complete absence of statutory auhtority for such rationalization.

Therefore, the retirement policy of the University, requiring professors to retire at sixty-five, contravenes Section

9-1-1530 which sets the mandatory retirement age at seventy (70).

RHODES and GREGORY, JJ., concur.

NESS, J., concurs in result.

LITTLEJOHN, J., dissents.

NESS, Justice (concurring):

I concur in result only with the majority opinion. I agree with the minority that Code Section 9-1-1530 is ambiguous and open to construction by the Court. This statute establishes only *mandatory* maximum retirement age and does not speak unequivocally on the question of retirement prior to age seventy. The Legislature was concerned only with setting a maximum age for retirement, as the question of involuntary retirement [1] before the attainment of seventy years was simply not addressed. It is therefore appropriate for this Court to look to administrative construction of contemporaneous statutes such as Code Section 59-117-40, as well as apparent legislative acquiescence [2] in such construction to determine the legislative intent of § 9-1-1530.

In this case there was no challenge made to the reasonableness of the University's regulations,[3] but rather to the University's power to enact such rules. I agree with that portion of the minority opinion which holds that the University has the authority (absent future legislative clarification) to set a reasonable retirement age below the statutory maximum. However, my concurrence is limited to those situations in which the proposed retirement age bears a rational

---

[1] Voluntary retirement at age sixty-five, or with thirty years service is allowed by § 9-1-1550 for "members," which includes both teachers and employees. § 9-1-10(b).

[2] However, legislative acquiescence in programs which may contravene an explicit statute must be carefully evaluated. For two recent cases dealing with the issue in a different context, see *TVA v. Hill,* . . U. S. ...., ...., 98 S. Ct. 2279, 57 L. Ed. (2d) 117 (1978), and *SEC v. Sloan,* .... U. S. ...., 98 S. Ct. 1702, 56 L. Ed. (2d) (1978).

[3] Such regulations are presumed valid until challenged. *Massachusetts Board of Retirement, et al. v. Murgia,* 427 U. S. 307, 96 S. Ct. 2562, 2567, 49 L. Ed. (2d) 520 (1976), note 5.

relationship[4] to legitimate University objectives. Common sense seems to support the minority's view that:

"The argument that some professors are highly competent until they are 70 cannot be refuted. However, others lose their energies and enthusiasms, so necessary to teaching, at a younger age."

Yet this record contains no statistics, professional opinions, or other evidence to support the bare assertion that retirement of college professors at age sixty-five bears a rational relationship to a legitimate University objective.[5]

Therefore, although I agree the University has the authority to declare a reasonable retirement age within the parameters of the statute, my agreement is limited to those instances where the chosen age bears a rational relationship to a legitimate University purpose.[6]

LITTLEJOHN, Justice (dissenting):

I respectfully dissent and would hold that the University had authority to inaugurate a retirement policy mandating that teaching faculty members retire at age 65.

The majority opinion, in my view, erroneously asserts: "The plain language of the statute allows for no interpretation restricting its application." The statute does not specify a minimum age for retirement. Accordingly, the statute is ambiguous on that point and becomes a proper matter for interpretation by this court. The very fact that the boards of trustees of nine institutions of higher learning and the Bud-

---

[4] The rational relationship test, rather than "strict scrutiny" is applied to claims of age-based discrimination. *Massachusetts Board of Retirement, et al. v. Murgia, supra.*

[5] It may well be that the Legislature has recognized the presumptive loss of teaching capacity at age sixty-five by setting that age as the general maximum retirement age for "teachers" in § 9-1-1520. However, recognition or presumption by the Legislature that a classification bears a rational relationship to a legitimate state interest does not insulate such a classification from this Court's scrutiny. See, *Marley v. Kirby,* 245 S. E. (2d) 604 (Iowa 1978); *Broome v. Truluck,* 241 S. E. (2d) 739 (Iowa 1978).

[6] For a recent Federal appeals court opinion in line with this view, see *Gault v. Garrison,* 569 F. (2d) 993 (7th Cir. 1977).

get and Control Board, over a period of some 20 years, have given to the statute a different interpretation than that arrived at by the majority opinion, makes out a *prima facie* case of ambiguity.

The University is a creature of the General Assembly. It has such duties and authority as the legislature has allocated to it. Section 59-117-40 reads in pertinent part as follows:

"The board of trustees of the University of South Carolina is and is hereby constituted a body corporate and politic, in deed and in law under the name of the University of South Carolina. Such corporation has the following powers:

. . . . .

(6) To appoint or otherwise provide for the appointment of subordinate and assistant officers and agents, faculty members, instructors and other employees prescribing the terms of their employments, their duties, and fixing their compensations;

(7) To make bylaws and all rules and regulations deemed expedient for the management of its affairs and its own operations not inconsistent with the Constitution and laws of this State or of the United States;

. . . . .

(12) To assign any member of the faculty to additional duties in any other University department than that in which the faculty member may at the time be working and without additional salary;

. . . . .

(14) To adopt such measures and make such regulations as may in the discretion of the board of trustees be necessary for the proper operation of the University;

. . . . .

(16) To remove any officer, faculty member, agent or employee for incompetence, neglect of duty, violation of University's regulations, or conduct unbecoming a person occupying such a position; . . ."

It is clear that the University board of trustees has broad general authority in the matter of dealing with its faculty and other employees. I am of the opinion that the University policy of retiring faculty members at age 65 is not inconsistent with the statutory retirement provision. The matter is well within the control of the University board of trustees under its statutory authority.

Such is consistent with the interpretation placed on the statute by nine of the institutions of higher learning over a period of many years. Counsel for the University submits in his brief, and such is not challenged by opposing counsel in written brief or in oral argument before us, that the following institutions have mandated retirement at age 65: University of South Carolina, Clemson University, Winthrop College, Francis Marion College, The Citadel, South Carolina State College, and Lander College. The Medical University and the College of Charleston have mandated retirement at age 70. The policy has been in effect at these institutions for varying periods of time, as much as 20 years. During all of this time, the General Assembly, presumably cognizant of the policy, has taken no action to bring about a change of the action of these institutions. In many cases, this court has held that "The construction of a statute by the agency charged with executing it is entitled to the most respectful consideration and should not be overruled without cogent reasons [cites omitted]." *Faile v. South Carolina Employment Sec. Commission,* 267 S. C. 536, 230 S. E. (2d) 219 (1976). I recognize, however, that in the last analysis interpretation is a matter for this court. The construction placed upon a statute by an administering agency or authority is merely one factor to be taken into consideration in interpreting a statute.

Our case law is consistent with the general law as found in 73 Am. Jur. (2d), *Statutes,* § 161:

"§ 161. Generally.

It is well settled, in case of doubt as to the meaning of a statute, that the courts may resort to contemporaneous con-

struction, especially where such construction has prevailed for a long period of time. This rule has been applied to a contemporaneous construction of another statute or another provision of the same statute, involving similar considerations.

It is sometimes declared that a particular statute, or a particular statutory provision, should be given a practical construction, or such a construction as would render the statute or provision practicable, or as practicable as possible. It has also been held that in the construction of a statute, the court may take into consideration the practical construction theretofore given the statute, or the manner in which the statute has been interpreted by the general public, or by those affected by the law, especially where such practical construction has been long continued."

Under the facts of this case, this rule of construction is particularly meaningful because the retirement system is administered by the State Budget and Control Board, which is composed of the Governor, the Chairman of the Senate Finance Committee, the Chairman of the House Ways and Means Committee, the State Comptroller General, and the State Treasurer. The interpretation which the University seeks is the interpretation which has been given to the statute by the many institutions of higher learning enumerated hereinabove, and is also the interpretation of the State Budget and Control Board. A majority of the board are directly involved in the legislative process. Over the years, the board has obviously honored the retirement of university and college professors at age 65, by providing the funds and paying the benefits to which retirees are entitled under the retirement law.

Having concluded that the University retirement policy is proper under the statute, I need not justify the reason for the rule. It is not, however, amiss to state that there is rationale for the failure of the General Assembly to establish a minimum retirement age. Employees in all fields of work come under the retirement system. For most employees, sev-

enty may be an appropriate age for retirement, but there are types of employment where discretion should be allowed. For example, we doubt that members of a fire department at a state institution should be required to work until they are 70 years of age. Obviously, it is the consensus of thinking of the boards of trustees of the various institutions of higher learning that 65 is an appropriate age for professors to retire. The argument that some professors are highly competent until they are 70 cannot be refuted. However, others lose their energies and enthusiasms, so necessary to teaching, at a younger age. It is not sufficient to say that incompetent professors between 65 and 70 years of age may be discharged for incompetence or other cause. This approach ignores the practical aspects of the problem. It is not feasible to act upon each employee's case based upon the particular facts, and therefore some established age limit is desirable under all retirement plans.

The defendants have argued that by amending the South Carolina Retirement Act, Statutes at Large No. 267 (1949), the legislature clearly evinced an intention that professors at institutions of higher learning not be required to retire until they reached the age of 70. The effect of this amendment was to reclassify college professors as "employees", so that they might be allowed to work until age 70, rather than as "teachers", who were not allowed to work past the age of 65. See §§ 9-1-10, 9-1-1530, 9-1-1520, 1976 *Code*. The defendants' reliance on this statutory amendment is misplaced. The fact that college and university professors might thereafter be allowed to work until they reached the age of 70 should not be construed as granting them an absolute right to work until attaining that age. Rather, the effect of the amendment was merely to vest colleges and universities with the right to continue their professors in employment, at the option of the institution, until the professors reached the age of 70, rather than the age of 65.

I would hold that the University acted within its statutory authority in requiring the retirement of each of the defendants at age 65.